A. W. Mericle, Administrator of the Estate of Rollie
J. Mericle, deceased, Plaintiff and Appellee, v.
Acme Cement Plaster Company and Florentine
Henry, Defendants and Appellants.

**Master and servant:** SCOPE OF EMPLOYMENT: EVIDENCE. In this action for the death of an employee while going into a mine to procure drinking water for the men, the evidence is held to support a finding that an employee acting as vice-principle directed the decedent to enter the mine for that purpose.

**Same:** NEGLIGENCE OF MASTER: EVIDENCE. Evidence reviewed and held to justify a finding that it was perilous for one without experience to make use of the elevator for the purpose of entering the mine, at the time decedent was injured, without warning and instruction to first ascertain the condition of the machinery operating the elevator.

**Same:** SCOPE OF EMPLOYMENT: NEGLIGENCE OF MASTER. Where an employee is not engaged for any particular task, but to do whatever he may be directed, he may recover for acts done within the scope of his employment and by direction of a vice-principal, from which injury results to him through the negligence of the master.

**Same:** DUTY TO WARN. Before a master is required to warn and instruct an adult employee it must appear that the employee was inexperienced or otherwise without knowledge of the peril, and that the employer was not aware of or had no reasonable ground to believe him inexperienced. And where the record is silent on these matters the presumption obtains that the employee knew the danger, and an issue of failure to warn should not be submitted.

**Contributory negligence:** EVIDENCE. Under the evidence the question of decedent's negligence in entering defendant's mine for drinking water was for the jury.

*Appeal from Webster District Court.*—Hon. C. G. LEE,
Judge.

WEDNESDAY, JUNE 26, 1912.

ACTION for damages resulted in judgment against
defendant, from which it appeals.—*Reversed.*

*Kelleher & O'Connor* for appellants.

*Healy & Healy* for appellee.

LADD, J.—The defendant is engaged in the manu-
facture and sale of gypsum products, with factory and
mine two or three miles south of Ft. Dodge. Rollie J.
Mericle had been employed on the night shift as operator
of a wood fiber saw two nights, and on the third was
assigned to work as weigher. The night shift went on
duty at seven o'clock p. m., and upon the arrival of
Mericle he was directed by the general foreman, as is
alleged, to get a pail of water. The well, out of which
water was pumped into a tank, was in the mine. Access
thereto was by the double shaft, near the bottom of which
was the tank. As he put his knee on the cage in the west
shaft which had stopped about one and one-half feet above
the ground, and had taken hold with one hand, it jerked
up, bringing him against a crossbeam about five feet above,
and he fell to the bottom of the shaft, receiving injuries
resulting in his death. Though many grounds of negli-
gence were charged, but one was submitted to the jury,
and that "that defendant was negligent in failing to in-
struct and warn plaintiff's intestate of the danger involved
in the use of the cage or elevator described in plaintiff's
petition, and that plaintiff's intestate, while in the dis-
charge of services for the master, was injured on account
of a danger of which he should have been warned."

I. Appellant first contends that Mericle was merely permitted, not directed, to get the water, and did so, not in obedience to the order of the foreman, but at the request of the engineer. Nimms, who was general night foreman of that portion of the plant above the surface, testified that there was some delay because the steam was not up, and that about 7:15 o'clock p. m. (Sunday, August 25, 1909) Mericle asked;

Where the drinking water was, and I told him it was in the pail beside the mill, and if there wasn't any there to go and get some. Q. Did you say where he could get some if there was none there? A. No, sir; I did not Q. Where was the place to get drinking water for employees? A. In the mine. That was the only place we could get drinking water at that time. (The witness then explained that the only way to reach the mine for water was by way of the shaft, and later on cross-examination said): *Rollie asked me where the water was.* Q. When did he ask you that? A. That was just before I went to the engine room, about quarter past seven. I showed him where the water pail was. I remember that distinctly; there is no question in my mind about that. I didn't go to the water bucket with him. Q. How far were you away from the water bucket when he asked you where the water was? A. I was about ten or fifteen feet. Q. You didn't know whether there was water in the bucket or not? A. No, sir. Q. You knew nothing about his going down into the mine for water at that time? A. No, sir. Q. And never told him to get water out of the mine, did you? A. No, sir. Q. Never ordered him into the mine to get water, did you? A. No, sir.

On redirect examination he was asked, "What was it you said to Rollie after you said to him, if there was no water in the pail?" and answered, "I said if there wasn't any there he could get some." Recalled for further cross-examination, the witness testified: "I didn't know he was going down into the mine after water. Q. You never thought he was going down in the mine after water? A.

I never thought anything about it. . . . Q. It wasn't
your intention that he should go down into the mine that
night? A. I didn't intend for him to go there, and that
is why I didn't tell him anything about the cage. . . .
Q. You didn't think that was an order for him to go
into the mine, did you? A. Well, I didn't stop to think
about it."

Of course, the jury might have concluded from this
testimony that the foreman merely gave decedent permis-
sion to obtain the water, or from the evidence of the
engineer and Pierce, who testified that the former re-
quested him to get a pail of water, that he was acting in
pursuance of such request; but neither of these conclusions
was necessarily to be inferred from the evidence recited.

According to Nimms, a pail was kept in the engine
room "all summer. Water was kept in it. It was used
for the purpose of drinking water for the men." Chase,
superintendent of the mine, testified that no particular
employee was designated to furnish the water to the em-
ployees. "Q. They would get the water from the well in
the mine? A. In the bottom out of the tank or out of the
casing, and one of the men would go down, using the
elevator or cage, and bring up a pail of water and put
it where the other employees could get it."

From this evidence the jury might well have con-
cluded that, as part of the plan or system of carrying on
the work, drinking water was kept at a place easily
accessible to the men, and, as needed, some
one of the employees attended to getting
water, as described. Probably this was
usually done voluntarily, but, if so, this did
not necessarily negative getting it, being a duty which the
foreman might exact from any one not assigned solely to
the performance of some particular task. Though decedent
had passed two nights at the wood fiber saw, he was
to weigh gypsum rock at the tipple or top of the shaft

1. MASTER AND
   SERVANT:
   scope of
   employment:
   evidence.

some twenty or twenty-four feet above the surface as soon as the steam was up enough to carry gypsum rock from the mine below, and quite naturally the foreman might have directed him, in the interim, to replenish the supply of water if exhausted. In doing so, he may not have thought out the route to be taken; but he knew the only place water could be obtained was in the mine, and that the only access thereto was by the elevator, and therefore his order, if such it was, necessarily contemplated that decedent should get the water from the mine. In addition thereto, the engineer may have and doubtless did tell or request him to get the water; but the engineer was not in authority, and the jury might well have inferred that decedent was acting in obedience to the foreman, acting as vice principal, rather than upon the request of a fellow servant. We are of the opinion that the evidence was sufficient to sustain the answer to the special interrogatory that Nimms directed decedent to get water from the mine.

II.   The evidence was such as to indicate that the use of the elevator when water was being forced from the engine cylinders was dangerous. After the conversation with Nimms, decedent entered the engine room. The engineer, Henry, testified that he knew he "was going to try to go down into the mine to get a pail of water," and "told him I would let him down. . . . I asked him to get a bucket of water, and a pail was sitting there that I had cleaned out already, and I went to the shanty and got him a cap and lamp. He come there with me, and I says: 'Do you know where the well is?' He says, 'No,' and I laid it out to him over the ground, gave him the directions, and I said, 'I will go and get the water out of the mine cylinders and give you the east cage and land it for you,' and that is all I know. Then I left and went to the engine room. When I went there, I commenced to work the steam and

*2. SAME: negligence of master: evidence.*

try to drain my cylinders. Then I pulled the cage up and got pretty near to the top, when Pierce hollered to me."

This was done by opening the pet cocks and letting the steam in the cylinders, and the effect is thus described by the engineer:

When I turn the steam on with the throttle of the engine, the cages work up and down, and that works the water out of the engine. There is a drum there as a part of the engine. This drum is four and one-half or five feet in circumference—in diameter, and the cable is wrapped around the drum, and it is the movement of the drum that gives out or takes up the cable. When one cage is being taken up, the other cage is being let down in the shaft, so when I was raising the west cage the east cage was going down. It was not my purpose to stop the west cage at the landing. It was my purpose to stop the east cage at the landing when I brought it up again if I had the water all out. The shafts stand side by side. They are divided by a wall about eight inches in thickness, and they face straight south to the opening which is south. . . . When I went in there to turn on the steam, I applied the steam easily. I didn't put it on and cut it off again. I put it on and kept it on. There were marks on the wall to tell where the cage was. In operating the engine I looked at these marks, and from them I knew when the cage was in the shaft, and knew when it was out of there, but I knew just about where it was. There is a separate entrance to each cage. . . . I did not expect Mericle to try to get into the west cage. I told him I would give him the east cage, and I told him I would work the water out of the cylinder before I gave him the east cage. I don't know as I said out of the cylinders. I said out of the engine. . . . Just as the water leaves, it would jerk. She would jerk when she took a revolution. . . . At the time Mericle was hurt, the west cage was making its first trip to the top, and the east cage was making its first trip down.

The west cage was used to raise gypsum rock, though occasionally for passengers, and the east one for passengers.

Other witnesses corroborated the engineer in saying

he had pursued the proper method in eliminating water from the cylinders. One Pierce, who had arrived from Ft. Dodge, was the only eye witness of the accident. He confirmed the engineer's testimony as to the conversation prior to the turning on of steam, and added that Henry then cleaned the bucket and gave it to Mericle;

> And told him he would go in and stop the cage—he would run the engine and stop the cage at the ground, or start the engine. I don't know which. . . . After Henry went to the engine, there was a movement of the cage. . . . I really don't know whether it came up or went down. I believe it came up and stopped a foot or a foot and a half above the landing on the west side. Q. What did Rollie do then? A. Put his foot on the cage and put his knee on the platform and took hold of it with one hand, and then the cage went up. I don't know as I understand the question. You mean was the cage standing still at the time he put the pail on and he went to get on? It was standing still, and he got half way on, and the cage started and went away with him and went up. When the cage started to go up, he hit the crossbeam about five feet above him between him and the cage. After that the cage ascended further, and he fell to the bottom of the shaft. . . . The time he landed the cage had stopped. They were just there together. They both got there just about the same time. He placed the pail on ahead of himself, and then he started to get on. He only got the knee of one leg on the cage. The other leg was hanging down as he went up. . . . He was braced with his knee on the cage and holding the cage rod. That was the condition of his body as it disappeared. The cage hesitated between there between ten and twenty seconds, I suppose.

From this evidence the jury must have found that for any one to have undertaken to get into either cage after steam had condensed in the cylinders and while the water was being eliminated was perilous, and that a person without experience ought not to be directed to make use of the elevator at or about that time without warning or instruc-

tion of the necessity of first ascertaining that this had been accomplished.

III. The defendant contends that the evidence was not such as to carry the issue of failure to warn of the peril in the use of the elevator. The authorities cited, holding there to be no duty to warn save concerning perils within the scope of employment, require no attention, for the evidence discloses that decedent had not been engaged for any particular task, but inferably to perform what might be required of him, and, as he might have been and was found to have been acting under the direction of the vice principal, this in effect determined that he was within the scope of what he had undertaken to do.

3. SAME: scope of employment: negligence of master.

Before the master is required to warn a servant, especially an adult, however, it must appear that the servant, because of his inexperience or otherwise, is without knowledge of the perils about to beset him, and also that the master is aware of such want of information, or has reasonable ground so to believe. As said in *McCarthy v. Mulgrew*, 107 Iowa, 76, "the duty of the master to instruct and warn a servant only arises as to dangers which the master knows or has reason to believe the servant is ignorant of. It does not arise as to dangers known to the servant, or that are so open and obvious as that by the exercise of ordinary care he would have known of." In *Harney v. Ry.*, 139 Iowa, 359, it was said that: "Before an employer can be held liable for a failure to warn, there must be something to suggest to him that warning is necessary. Unless this necessity was, or ought to have been, known to him, he is considered to be justified in acting upon the assumption that the servant understood the dangers to which he was exposed, and would take appropriate precautions to safeguard himself." See also, *Newbury v. Mfg. Co.*, 100

4. SAME: duty to warn.

Iowa, 441; *Yeager v. Railway*, 93 Iowa, 1; *Fulwider v. Trenton Gas Co.*, 216 Mo. 582 (116 S. W. 508).

These and numerous other decisions are to the effect that, before an employer can be said to have been derelict in not warning an employee of the dangers of his employment, it must affirmatively appear that the employee was ignorant, and that the master knew or ought to have known of that. Did the evidence adduced warrant such a finding? The decedent was over twenty-one years of age, and, as his father testified, was well educated "for a young fellow," had been in school in Pleasant Valley township until he was sixteen years old, and that "part of the time he worked at the plaster board and the gypsum mills; that is, for some two or three years before he was hurt" and "up to the time he was killed, the only work he had done was what work he had done on the farm and what work he had done in the gypsum mills. He worked, I think, at the gypsum mill or mine, and then went down and worked in a blacksmith shop at Brushy the best part of the winter, and then came back and worked in the gypsum mill. I think he worked at the Butler & Rhodes mine."

Nimms testified that Mericle had been working around the gypsum mills from about the time he was seventeen years old at the Mineral City Mill, the Cordiff Company, and the Sackett Plaster Board. The evidence disclosed that the method adopted by Henry in eliminating water from the cylinder was that usually followed in other gypsum mills with like influences on the elevator. There was no proof as to who acting for defendant employed decedent; nor was there any evidence, save that of Nimms, as to whether he had been warned concerning the danger involved in the use of the elevator. Nimms testified that he never told Mericle, after he began work, of the manner the elevator worked and jumped. Had he informed him before? Did the agent or officer of defendant

who engaged the services of decedent advise him thereof? The record is silent on the subject. Nor is there any evidence in the record justifying the conclusion that decedent was not aware of the very peril mentioned. He had been employed in gypsum mills before, and also in a mine, so that the inference is that he did know, rather than that he did not. Moreover, there was nothing to put appellant on inquiry with reference thereto. In the absence of all evidence tending to prove decedent unaware of the peril in the use of the elevator and that defendant ought to have known that he was so unaware, this issue ought not to have been submitted to the jury.

IV. Again, it is argued that the evidence was conclusive as to decedent being guilty of contributing to his injury by his own negligence. True, Henry testified to having told him that he would go and get the water out of the engine and give him the east cage and land it for him. Pierce relates that Henry said "he would go in and stop the cage. He would run the engine and stop the cage at the ground, or start the engine, I don't know which." Pierce said he could not say that he had repeated everything said, but he claimed to be giving his best recollection, and, though he did not expressly deny the account given by Henry, what he said had that effect. If Pierce understood the engineer in that way, decedent might have done likewise, and if he did, when the cage stopped in front as an ordinarily prudent person, have supposed this was to enable him to get in, even though the cage was a foot or more above the surface. There was no error in submitting this issue to the jury.

5. CONTRIBUTORY NEGLIGENCE: evidence.

V. The seventh instruction is criticised for that it included the inquiry as to whether decedent was after a drink of water for himself. As the water pail from which to drink was kept in the engine room, and there was no proof that the mine was resorted to for this pur-

pose, that portion of the instruction might as well have been eliminated. The criticism of questions permitted over objection as leading is not well founded.

Because of the failure to prove any negligence on the part of defendant, the judgment is—*Reversed.*